# BENJAMIN I. TEDESCO *v.* CITY OF STAMFORD ET AL.
## (14301)

SHEA, CALLAHAN, GLASS, BORDEN and BERDON, Js.

Argued January 16—decision released June 2, 1992

234

*Lawrence M. Lapine,* with whom were *Christopher R. Bello* and, on the brief, *Robert S. Bello* and *Thomas M. Cassone,* for the appellant-appellee (plaintiff).

*James V. Minor,* assistant corporation counsel, for the appellees-appellants (named defendant et al.).

BORDEN, J. The dispositive issue in this appeal and cross appeal is whether a municipal employee whose employment was terminated was afforded his fourteenth amendment right to procedural due process by the union grievance procedures established under a collective bargaining agreement.[1] The plaintiff, Benjamin Tedesco,[2] appeals from the judgment of the Appellate Court reversing the trial court's award to the plaintiff of compensatory damages and attorney's fees for the violation of 42 U.S.C. § 1983[3] by the defendant, the city

---

[1] This is the fourth time this case has been before an appellate court. See *Tedesco* v. *Stamford,* 20 Conn. App. 51, 563 A.2d 1046 (1989), rev'd, *Tedesco* v. *Stamford,* 215 Conn. 450, 576 A.2d 1273 (1990), on remand, *Tedesco* v. *Stamford,* 24 Conn. App. 377, 588 A.2d 656 (1991).

[2] Benjamin Tedesco died on January 30, 1988, and we granted permission to substitute his executrix, Anita Docimo, as plaintiff. See *Tedesco* v. *Stamford,* 215 Conn. 450, 454 n.5, 576 A.2d 1273 (1990). We refer to Benjamin Tedesco as the plaintiff.

[3] Title 42 of the United States Code, § 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities

of Stamford.[4] The defendant cross appeals from the judgment of the Appellate Court holding that the post-termination hearing that was afforded to the plaintiff was "constitutionally deficient" and awarding the plaintiff one dollar in nominal damages. We reverse the judgment of the Appellate Court on the defendant's cross appeal. This renders the plaintiff's appeal moot.

The relevant facts are as follows. On September 11, 1980, the plaintiff, while employed as a trash collector[5] for the city, suffered a torn rotator cuff in his right shoulder. On January 30, 1981, the plaintiff underwent surgery on his shoulder. The plaintiff did not return to work after his injury, although he did remain on the payroll and received his full salary. When the shoulder failed to improve significantly, the plaintiff underwent a second operation on November 30, 1981. On the same day, the defendant sent the plaintiff a letter that his employment was terminated because "[t]he letter of prognosis [from the plaintiff's doctor, John Carino] . . . states that you will not be able to return to work for an unestimated period of time . . . and does not anticipate that you will be returning to your regular occupation for a prolonged period of time."

On December 7, 1981, the plaintiff filed a grievance with his union, Teamster Local Union No. 145 (union), seeking to be restored to his position as a laborer. On

secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."

[4] The first count of the plaintiff's complaint named as defendants the city of Stamford, the city's personnel appeals board and the cochairman of the board. We treat these defendants collectively as the city of Stamford. See *Tedesco* v. *Stamford,* 215 Conn. 450, 451 n.2, 576 A.2d 1273 (1990).

[5] The plaintiff's position was classified as Laborer 1 in the sanitation department of the defendant's department of public works. His primary responsibility entailed removing trash from the street curb and placing it in a sanitation truck.

that same day, the union business agent, Dominic Lamberti, and the sanitation department shop steward, Jimmy Bolanis, met with the deputy commissioner of the defendant's department of public works, John Canavan, for forty-five minutes to discuss the plaintiff's grievance. At that meeting Canavan produced the plaintiff's absenteeism record[6] and stated "[w]e can't tolerate this kind of performance because he is more out than he is in." Lamberti explained that many of those absences were due to injury and were not the plaintiff's fault, but Canavan refused to reinstate the plaintiff.

Lamberti then made an appointment to discuss the plaintiff's grievance with the commissioner of the department of public works, Bruce Spaulding, pursuant to the collective bargaining agreement.[7] A meeting was held on December 10, 1981, and in attendance were Spaulding, Lamberti, Canavan, Bolanis and Vincent Capoccitti, a union representative. The commissioner produced letters from Carino, stating that the plaintiff would not be able to work for a "prolonged" and "unestimated" period of time. Despite the urgings of Lamberti, Bolanis and Capoccitti to the commissioner to reinstate the plaintiff, the commissioner denied the plaintiff's grievance. The union thereafter refused to pursue the plaintiff's grievance before the Connecti-

---

[6] The record of absenteeism showed that the plaintiff had been out of work for periods of time totaling more than two years out of the fifteen years he had worked for the city.

[7] On July 1, 1980, the defendant and the union had entered into a collective bargaining agreement in which the defendant recognized the union as the exclusive bargaining agent of the employees in the public works department. Pursuant to this agreement, "the employee and the Union's business representative . . . shall . . . take the grievance up with the Commissioner of Public Works . . . and a decision thereon shall be given to the Business Representative within five (5) working days after termination of this meeting in writing." Lamberti testified that the meetings he had had with the city officials took place pursuant to the grievance procedures in the collective bargaining agreement.

cut board of mediation and arbitration because, in the union's view, the plaintiff's case was too weak. Lamberti, a union representative with eighteen years of experience, testified that he had handled over 150 grievances prior to December 10, 1981, and that he did not "think . . . [he had] a . . . chance to win this case." The plaintiff, through counsel, made numerous attempts to secure a hearing with the defendant but all requests were denied because the union was the exclusive bargaining agent for the plaintiff.

The plaintiff brought the present action by filing a complaint in the Superior Court on August 31, 1982. The first count of a subsequent amended complaint alleged that the defendant had violated the plaintiff's right to procedural due process by failing to afford the plaintiff a hearing.[8] On August 29, 1988, after a court trial, the court, *Cioffi, J.*, concluded that the first count of the plaintiff's complaint stated "a cause of action sounding in violations of both federal and state constitutional rights embodied in 42 U.S.C. § 1983."[9] The

---

[8] "The second count of the complaint, directed against the plaintiff's union for failing to prosecute his grievance before the Connecticut board of mediation and arbitration, and the third count, directed at the city for refusing to permit the plaintiff to pursue the collective bargaining agreement grievance procedures in his own behalf, were dismissed by the trial court, and their dismissal has not been challenged on appeal. Similarly, the plaintiff has not raised on appeal the failure of the trial court to render judgment on the fourth count of his complaint, which the defendants claimed had not been properly added by amendment." *Tedesco* v. *Stamford,* 215 Conn. 450, 454 n.4, 576 A.2d 1273 (1990).

[9] On January 21, 1987, just before the trial was scheduled to begin, the union filed a motion to stay the proceedings to allow the union and the city to arbitrate the plaintiff's grievance before the Connecticut board of mediation and arbitration. The trial court, *Lewis, J.*, granted the motion. Following a hearing, the Connecticut board of mediation and arbitration, on September 21, 1987, converted the plaintiff's termination to a suspension without pay and ordered the defendant to reinstate the plaintiff to the position of laborer "on the condition that prior to his reinstatement he be examined by a mutually agreed upon physician who certifies that the grievant is physically able to perform the job." Prior to trial in the present case,

court held that pursuant to *Cleveland Board of Education* v. *Loudermill,* 470 U.S. 532, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985), the plaintiff, having a property interest in his employment, was entitled to a pretermination hearing. The court further held that since the defendant failed to provide the plaintiff with a pretermination hearing, it was required to provide the plaintiff with a posttermination hearing. The court concluded that the December 7 and 10 meetings between the union and city officials "did not comport with the requirements of a post-termination hearing because those hearings with Mr. Canavan and/or Commissioner Spaulding were not before a neutral and unbiased decisionmaker." The court also concluded that the arbitration hearing held in 1987; see footnote 9, supra; was not a constitutionally sufficient posttermination hearing because it did not "take place within a meaningful time after the termination." Based on those conclusions, the court awarded the plaintiff $41,084.44 in compensatory damages and $47,085.50 in attorney's fees pursuant to 42 U.S.C. § 1988. The court dismissed the remaining counts as moot.

The defendant appealed to the Appellate Court, which reversed the judgment of the trial court and remanded the case with direction to render judgment for the defendant. The Appellate Court concluded that the plaintiff's complaint did not state a cause of action under 42 U.S.C. § 1983 because the complaint did not allege that the deprivation of the plaintiff's due process right "occurred through the operation of a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." (Internal quotation marks omitted.) *Tedesco* v. *Stam-*

the trial court, *Cioffi, J.,* denied the union's motion to confirm the arbitration award on the ground that the arbitration proceeding was untimely. On January 3, 1990, however, the trial court, *Landau, J.,* confirmed the award.

*ford,* 20 Conn. App. 51, 56, 563 A.2d 1046 (1989). On the plaintiff's first appeal to this court, we concluded that "[t]he defendant had sufficient notice that the plaintiff was pursuing a cause of action under 42 U.S.C. § 1983 to prepare its defense and was not misled or surprised by the plaintiff's failure to allege specifically that his constitutional rights were violated as the result of a municipal policy. The defendant's failure to object to the introduction of evidence concerning the city's policies and its failure to claim any prejudice further supports this conclusion." *Tedesco* v. *Stamford,* 215 Conn. 450, 463, 576 A.2d 1273 (1990). We therefore reversed the judgment of the Appellate Court and remanded the case to the Appellate Court for further proceedings.

On remand, the Appellate Court first concluded that the confirmation by the trial court, *Landau, J.,* of the 1987 arbitration proceeding; see footnote 9, supra; did not render the plaintiff's claim moot since "[a]n employee's rights under 42 U.S.C. § 1983 cannot be precluded by a decision in an arbitration proceeding. *Alexander* v. *Gardner-Denver Co.,* 415 U.S. 36, 94 S. Ct. 1101, 39 L. Ed. 2d 147 (1974). An arbitrator is limited to determining an employee's rights under a collective bargaining agreement, whereas the resolution of more difficult constitutional issues remains in the province of the courts." *Tedesco* v. *Stamford,* 24 Conn. App. 377, 379-80, 588 A.2d 656 (1991). The Appellate Court concluded further that based on "[s]ubsequent federal law," the earlier decision of the trial court, *Cioffi, J.,* that the plaintiff had been entitled to a pretermination hearing when he was discharged in November, 1981, must be reversed. The Appellate Court noted that the trial court had relied on *Cleveland Board of Education* v. *Loudermill,* supra, which, in 1985, established the right to a pretermination hearing. The Appellate Court concluded, however, that pursuant to *Zinker* v. *Doty,* 907 F.2d 357 (2d Cir. 1990), "the *Loudermill* decision

cannot be applied retroactively to give the plaintiff a right that he did not have at the time of his termination." *Tedesco* v. *Stamford,* supra, 24 Conn. App. 380–81.

The Appellate Court next considered whether the plaintiff was afforded a meaningful posttermination hearing. The court concluded, without explanation, that "the hearing afforded the plaintiff was constitutionally deficient . . . ." Id., 381. The court further concluded, however, citing *Carey* v. *Piphus,* 435 U.S. 247, 98 S. Ct. 1042, 55 L. Ed. 2d 252 (1978), that the plaintiff was "not entitled to recover anything greater than nominal damages for the justified deprivation of an interest protected by the constitution" since the "record in the arbitration proceedings, of which we took judicial notice, [is] replete with medical reports stating that the plaintiff could not return to work, and would never be able to return to his job in the future." *Tedesco* v. *Stamford,* supra, 24 Conn. App. 382–83. The Appellate Court, therefore, reversed the award of compensatory damages. Finally, the Appellate Court concluded that the plaintiff was not entitled to attorney's fees since he had failed to produce contemporaneous time records. Id., 385.

We granted the plaintiff's petition for certification limited to the following issues: "1. Did the Appellate Court properly reverse the trial court's award of attorney's fees based on an absence of contemporaneous time records? 2. Did the Appellate Court properly reverse the award of compensatory damages?" *Tedesco* v. *Stamford,* 219 Conn. 911, 593 A.2d 136 (1991). We also granted the defendant's petition for certification to cross appeal on the following issue: "Did the Appellate Court properly determine that the union grievance process and decision of the board of mediation and arbitration was 'constitutionally deficient' and direct that the plaintiff be awarded nominal damages?" *Tedesco* v. *Stamford,* 219 Conn. 910, 593 A.2d 135 (1991).

In its cross appeal, the defendant claims that the Appellate Court improperly concluded that the union grievance procedures in the collective bargaining agreement did not satisfy the plaintiff's right to due process.[10] The defendant argues that affirming the Appellate Court decision would undermine the union's discretion in deciding which claims to bring to arbitration and would unduly burden the labor relations process. The plaintiff claims, on the contrary, that the grievance procedures in the collective bargaining agreement did not give him all the process that he was due.[11] We agree with the defendant that, in this case, the grievance procedures in the collective bargaining agreement satisfied the plaintiff's right to procedural due process.

The fourteenth amendment to the United States constitution provides that the "State [shall not] deprive any person of life, liberty, or property, without due process of law . . . ." In order to prevail on his due process claim, the plaintiff must prove that: (1) he has been deprived of a property interest cognizable under the due process clause; and (2) the deprivation of the property interest has occurred without due process of law. See *Double I Limited Partnership* v. *Planning & Zoning Commission*, 218 Conn. 65, 76, 588 A.2d 624 (1991); *Connecticut Education Assn.* v. *Tirozzi*, 210 Conn. 286, 293, 554 A.2d 1065 (1989); see also comment, "Developments in the Law—Public Employment," 97 Harv. L.

[10] The defendant also claims that the Appellate Court improperly concluded that the 1987 decision of the Connecticut board of mediation and arbitration did not satisfy the plaintiff's right to due process. The plaintiff claims, to the contrary, that the arbitration hearing violated his procedural due process rights. See footnote 9, supra. Because we conclude that the grievance procedures in the collective bargaining agreement satisfied the plaintiff's right to due process, we need not consider either of these claims.

[11] The plaintiff also claims that he was entitled to a hearing pursuant to a certain provision in the Stamford city charter. This issue is beyond the issues certified and, therefore, will not be addressed.

Rev. 1611, 1781 (1984). It is undisputed that the plaintiff had a property interest in his continued employment with the defendant because the collective bargaining agreement stated that he could be terminated only for "just cause."[12] The issue then is whether the plaintiff was deprived of this property interest without due process of law. See *Federal Deposit Ins. Corporation* v. *Mallen,* 486 U.S. 230, 240, 108 S. Ct. 1780, 100 L. Ed. 2d 265 (1988); *Morrissey* v. *Brewer,* 408 U.S. 471, 481, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972).

"[T]he due process clauses of the state and federal constitutions require that one subject to significant deprivation of liberty or property must be accorded adequate notice and a meaningful opportunity to be heard." *Counsel on Probate Judicial Conduct re: James H. Kinsella,* 193 Conn. 180, 207, 476 A.2d 1041 (1984); *Sager* v. *GAB Business Services, Inc.,* 11 Conn. App. 693, 695, 529 A.2d 226 (1987). We note, however, that "[d]ue process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances. *Cafeteria Workers* v. *McElroy,* 367 U.S. 886, 895 [81 S. Ct. 1743, 6 L. Ed. 2d 1230] (1961). [D]ue process is flexible and calls for such procedural protections as the particular situation demands. *Morrissey* v. *Brewer,* 408 U.S. 471, 481 [92 S. Ct. 2593, 33 L. Ed. 2d 484] (1972). Accordingly, resolution of the issue whether the [grievance] procedures provided here are constitutionally sufficient requires analysis of the governmental and private interests that are affected."

---

[12] "Generally speaking, courts have recognized a property interest if, by statute, rule or contract, express or implied, the employee can only be fired for 'cause,' e.g., *Arnett* v. *Kennedy,* 416 U.S. 134, 94 S. Ct. 1633, 40 L. Ed. 2d 15 (1974) . . . . *Ventetulo* v. *Burke,* 470 F. Sup. 887, 891 (D.R.I. 1978), aff'd, 596 F.2d 476 (1st Cir. 1979). The plaintiff, therefore, has a property interest that is protected by due process." (Internal quotation marks omitted.) *Bartlett* v. *Krause,* 209 Conn. 352, 367, 551 A.2d 710 (1988).

(Internal quotation marks omitted.) *Mathews* v. *Eldridge,* 424 U.S. 319, 334, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976); see also comment, supra, 1791.[13]

In *Mathews* v. *Eldridge,* supra, 335, the court stated that the "specific dictates of due process generally [require] consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Applying these factors to the present case, we conclude that the plaintiff's right to procedural due process was not violated.

"[T]he significance of the private interest in retaining employment cannot be gainsaid. [The United States Supreme Court has] frequently recognized the severity of depriving a person of the means of livelihood. See *Fusari* v. *Steinberg,* 419 U.S. 379, 389 [95 S. Ct. 533,

---

[13] The Appellate Court correctly concluded that the United States Supreme Court decision of *Cleveland Board of Education* v. *Loudermill,* 470 U.S. 532, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985), cannot be applied retroactively in this case. In *Loudermill,* the United States Supreme Court held that before an employee with a property interest in his continued employment can be terminated, he is entitled to an informal pretermination hearing. Id., 542–43. In *Zinker* v. *Doty,* 907 F.2d 357, 361 (2d Cir. 1990), the Second Circuit Court of Appeals determined that *Loudermill* did not declare existing law, but rather established new law and, therefore, pretermination hearings were not constitutionally mandated prior to the date of the *Loudermill* decision. Since the plaintiff's employment in the present case was terminated prior to the decision in *Loudermill,* he was not constitutionally entitled to a pretermination hearing. Even if we were to apply *Loudermill* retroactively, however, it is unclear whether that decision would be controlling since *Loudermill* did not consider what process a public employee is due when there are union grievance procedures set in place by a collective bargaining agreement.

42 L. Ed. 2d 521] (1975); *Bell* v. *Burson,* [402 U.S. 535, 91 S. Ct. 1586, 29 L. Ed. 2d 90 (1971)]; *Goldberg* v. *Kelly,* 397 U.S. 254, 264 [90 S. Ct. 1011, 25 L. Ed. 2d 287] (1970); *Sniadach* v. *Family Finance Corp.,* 395 U.S. 337, 340 [89 S. Ct. 1820, 23 L. Ed. 2d 349] (1969). While a fired worker may find employment elsewhere, doing so will take some time and is likely to be burdened by the questionable circumstances under which he left his previous job. See *Lefkowitz* v. *Turley,* 414 U.S. 70, 83–84 [94 S. Ct. 316, 38 L. Ed. 2d 274] (1973)." *Cleveland Board of Education* v. *Loudermill,* supra, 543. Moreover, the government's interest in immediate termination, standing alone, does not outweigh the plaintiff's interest in retaining employment. See id., 544.

The plaintiff's interest, however, is tempered in this case by the societal interest in an orderly and efficient system of dispute resolution in the public sector in the form of union grievance procedures set forth in a collective bargaining agreement, with benefits inuring to both employer and employee.[14] See *School Administrators Assn.* v. *Dow,* 200 Conn. 376, 511 A.2d 1012 (1986) (grievance procedures are preferred method of resolving disputes); *Antinore* v. *State,* 49 App. Div. 2d 6, 371 N.Y.S.2d 213 (1975), aff'd, 40 N.Y.2d 921, 358 N.E.2d 268, 389 N.Y.S.2d 576 (1976) (binding arbitration procedures must be viewed as advancing public good by expedition of resolution of disciplinary disputes in simpler, more prompt manner). As the United States

---

[14] There can be no question that collective bargaining through union representation is beneficial to employees. Most collective bargaining agreements "have provisions governing wages, hours, discipline, promotions, medical and health insurance, pensions, vacations and holidays, work assignments, seniority and the like." R. Gorman, Labor Law—Basic Text (1976) p. 540. Collective bargaining "provides the worker with a system of industrial government or industrial jurisprudence which protects his rights and privileges in his workplace." M. Wortman & C. Randle, Collective Bargaining (2d Ed. 1966) pp. 4–5.

Court of Appeals for the Seventh Circuit noted in *Parrett* v. *Connersville,* 737 F.2d 690, 696 (7th Cir. 1984), "[a]lthough the framers of the Fourteenth Amendment . . . could not have foreseen the rise of public-employee unions, grievance procedures, and other phenomena of modern labor relations . . . the concept of due process is sufficiently flexible to allow the courts to work out an accommodation between the interest in an orderly system of labor relations in the public sector as elsewhere and public employees' interest in procedural protections of job rights classified as property rights."

The plaintiff's interest in the present case is also tempered when one balances the minimal risk of an erroneous deprivation of the plaintiff's property interest through the procedures used in the collective bargaining agreement against the minimal value additional procedural safeguards would provide and the adverse effect such additional safeguards would have on the labor relations process. In *Parrett* v. *Connersville,* supra, 696, the court stated that "[t]he standard test of procedural adequacy under the due process clause, that of *Mathews* v. *Eldridge,* [supra, 335,] merely requires a comparison of the costs and benefits of giving the plaintiff a more elaborate procedure than he actually received. There is no basis under this test for blanket disqualification of arbitration, which businesses often use to resolve multi-million dollar disputes, and which is the standard method of protecting job security in unionized plants and facilities in the private sector. If the dispute is the type for which arbitration is well suited—and disputes over job rights fit that bill— then the gains from additional procedure, in reducing the chance of error, may well be smaller than the costs of additional procedure, especially when are added to the direct costs the indirect costs in disrupting orderly labor relations by bypassing the grievance procedure set up by a collective bargaining agreement."

In the present case, the risk of an erroneous deprivation of the plaintiff's property interest under the grievance procedures in the collective bargaining agreement was minimal. Article XXV of the collective bargaining agreement, entitled "Grievance and Arbitration Procedure," provided the following: "Any grievance arising between the City and the Union or any employee shall be settled in the following manner:

"A. The aggrieved employee and/or Union Steward shall attempt to adjust the grievance with the employee's immediate supervisor within ten (10) working days after the grievance arose.

"B. If a satisfactory adjustment of the grievance is not effected with such supervisor, the employee and/or the Union Steward shall submit a statement of the grievance in writing to the Commissioner of Public Works . . . . The employee and the Union's business representative or the Union Steward shall then take the grievance up with the Commissioner of Public Works . . . and a decision thereon shall be given to the Business Representative within five (5) working days after termination of this meeting in writing. . . .

"D. At the request of the City or the Union, any grievance not settled as the result of the procedure provided for above shall be submitted to the Connecticut Board of Mediation and Arbitration who shall hear the grievance according to its rules and regulations. . . .

"E. The procedures set forth herein for settlement of grievances and/or the review of disciplinary action shall be the exclusive method of settlement of grievances and/or the review of disciplinary action."

Pursuant to the agreement, the plaintiff, through the union or by his own initiation, was afforded two meetings with city officials in order to attempt to resolve

his grievance.[15] The plaintiff was represented by his union representatives at both meetings, one with the deputy commissioner, which lasted forty-five minutes, and one with the commissioner, which lasted one and one-half hours. After the second meeting, the plaintiff's union representatives discussed whether the union should submit the plaintiff's claim to the Connecticut board of mediation and arbitration. Thereafter, the union decided not to take the claim to arbitration because, in its opinion, the case was too weak.[16]

The union, however, did not have unfettered discretion when deciding whether to take the plaintiff's grievance to arbitration. As the exclusive bargaining representative of the plaintiff, the union had the right and obligation to act for the plaintiff and to represent his interests. See General Statutes § 7-468.[17] As such,

---

[15] The plaintiff argues that the provisions of the collective bargaining agreement do not apply because they are silent on the matter of termination of an employee. In support of this claim, the plaintiff notes that the collective bargaining agreement does not define the term "grievance." The plaintiff is apparently arguing, therefore, that since it is unclear whether a termination is a grievance, the union grievance procedures in the collective bargaining agreement do not apply. It is hard to imagine, however, any employer action that would more aptly give rise to a grievance than a termination. Indeed, the plaintiff filled out a grievance form and submitted it to his union representative, who pursued it through the grievance process. Therefore, the collective bargaining agreement did provide procedures for resolving a disputed termination.

[16] Pursuant to the collective bargaining agreement, the union was not required to submit the plaintiff's grievance to the arbitration board. Article XXV (D) of the agreement provided that "[a]t *the request of the City or the Union,* any grievance not settled as the result of the procedure provided for above shall be submitted to the Connecticut Board of Mediation and Arbitration . . . ." (Emphasis added.) The union did not request arbitration in this case. See also *Vaca* v. *Sipes,* 386 U.S. 171, 177, 87 S. Ct. 903, 17 L. Ed. 2d 842 (1967) (employee has no absolute right to have his grievance taken to arbitration).

[17] General Statutes § 7-468 provides in pertinent part: "RIGHTS OF EMPLOYEES AND REPRESENTATIVES. . . .

"(b) When an employee organization has been designated by the state board of labor relations as the representative of the majority of the employ-

it was required to act on the plaintiff's behalf in his best interest. A union must represent its members in good faith. See *Air Line Pilots Assn. International* v. *O'Neill*, 499 U.S. 65, 111 S. Ct. 1127, 113 L. Ed. 2d 51 (1991); *Vaca* v. *Sipes*, 386 U.S. 171, 177, 87 S. Ct. 903, 17 L. Ed. 2d 842 (1967). If an employee's grievance has merit, the union must proceed to arbitration. "[A] union may not arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion . . . ." *Vaca* v. *Sipes*, supra, 191. In this context, pursuant to the grievance procedures, the plaintiff, through the union, did have an *opportunity* to be heard by an impartial decisionmaker, namely, the Connecticut board of mediation and arbitration. That opportunity was limited, however, by the union's discretion as to which grievances to submit to arbitration, which was, in turn, informed by the union's duty to represent the plaintiff in good faith. If a union fails to submit a meritorious grievance to arbitration, an employee may sue the union for breach of its duty of fair representation. See id., 177; see also *Winston* v. *United States Postal Service*, 585 F.2d 198, 208 (7th Cir. 1978).

Accordingly, we conclude that there was a minimal risk of an erroneous deprivation of the plaintiff's property interest through the grievance procedures in the collective bargaining agreement. First, under the agreement, the plaintiff was afforded two mandatory

ees in an appropriate unit, or has been recognized by the chief executive officer of a municipal employer as the representative of the majority of employees in an appropriate unit, *that employee organization shall be recognized by the municipal employer as the exclusive bargaining agent for the employees of such unit.*

"(c) When an employee organization has been designated in accordance with the provisions of sections 7-467 to 7-477, inclusive, as the exclusive representative of employees in an appropriate unit, *it shall have the right to act for and to negotiate agreements covering all employees in the unit and shall be responsible for representing the interests of all such employees without discrimination and without regard to employee organization membership.*" (Emphasis added.)

meetings between the union and city officials where the union, representing the plaintiff's interests, presented the merits of his grievance to city officials. Both the union and the employer understood that if the dispute was not resolved, each side had the right to submit the grievance to arbitration. Since an impartial arbitration board was always available as a forum to resolve the grievance, each side had an incentive to deal fairly and honestly in resolving the dispute, thereby minimizing the risk that the plaintiff would be erroneously and arbitrarily deprived of his property. Furthermore, the union had an added incentive to fight zealously for meritorious claims, since a dissatisfied employee could sue the union for breach of its duty of fair representation. In light of the minimal risk of an erroneous deprivation of the plaintiff's property right under the collective bargaining agreement, we find that the value of additional or substitute procedural safeguards was limited. Indeed, additional procedures may have adversely affected the labor relations process, thereby adversely affecting the plaintiff.

The plaintiff claims, nonetheless, that due process required that the defendant should have afforded him a hearing, regardless of the union's discretion to decide which grievances to take to arbitration pursuant to the collective bargaining agreement. We disagree. Requiring the city to give each aggrieved employee a separate hearing despite the union's decision not to take a grievance to arbitration would effectively dispense with the union's right to screen grievances; see *Vaca v. Sipes,* supra; and would bypass the grievance procedures that are set in place for the employee's benefit. The practical result of allowing a separate hearing for the employee outside of what is provided for in the collective bargaining agreement would be to allow an employee to compel arbitration even if the union determines that the grievance is meritless. This result would

not only undermine the union's control over the griev-
ance process,[18] but would be contrary to the United
States Supreme Court decision in *Vaca* v. *Sipes,* supra,
177.

In *Vaca,* an employee, claiming to have been wrong-
fully discharged by his employer in violation of the col-
lective bargaining agreement, filed a grievance with
his union. After processing the employee's claim
through four steps of the grievance process afforded
by the collective bargaining agreement, the union
refused to submit the employee's claim to arbitration.
The employee brought suit against the union, claim-
ing that the union had breached its duty of fair repre-
sentation in its handling of his grievance. The court held
that an employee does not have "an absolute right to
have his grievance taken to arbitration . . . ." Id.,
191. The court noted that "[i]n providing for a griev-
ance and arbitration procedure which gives the union
discretion to supervise the grievance machinery and
to invoke arbitration, the employer and the union con-
template that each will endeavor in good faith to set-
tle grievances short of arbitration. Through this
settlement process, frivolous grievances are ended prior
to the most costly and time-consuming step in the griev-

---

[18] As one commentator has noted, "[u]nion control over the processing
of grievances not only enhances union strength but also may be essential
to it to the extent that grievance resolution is part of the ongoing collec-
tive bargaining process. . . . That benefits in employee welfare result from
union power is an assumption that has had a powerful influence in the
development of private sector doctrine and it should be a consideration in
any due process analysis as well.

"A second, more important justification for the union's control over the
grievance process is that theoretically it enhances the process itself. By
weeding out frivolous grievances, the union may be increasing the overall
chance of success of a meritorious grievance. An employee simply stands
a better chance of fair treatment if both parties retain confidence in an
efficient grievance resolution system." Note, "Public Sector Grievance
Procedures, Due Process, and the Duty of Fair Representation," 89 Harv.
L. Rev. 752, 783–84 (1976).

ance procedures. Moreover, both sides are assured that similar complaints will be treated consistently, and major problem areas in the interpretation of the collective bargaining contract can be isolated and perhaps resolved. And finally, the settlement process furthers the interest of the union as statutory agent and as coauthor of the bargaining agreement in representing the employees in the enforcement of that agreement. See Cox, Rights Under a Labor Agreement, 69 Harv. L. Rev. 601 (1956)." Id.

The court reasoned further: *"If the individual employee could compel arbitration of his grievance regardless of its merit, the settlement machinery provided by the contract would be substantially undermined, thus destroying the employer's confidence in the union's authority and returning the individual grievant to the vagaries of independent and unsystematic negotiation.* Moreover, under such a rule, a significantly greater number of grievances would proceed to arbitration. This would greatly increase the cost of the grievance machinery and could so overburden the arbitration process as to prevent it from functioning successfully. See *NLRB* v. *Acme Industrial Co.,* 385 U.S. 432, 438 [87 S. Ct. 565, 17 L. Ed. 2d 495 (1967)]; Ross, Distressed Grievance Procedures and Their Rehabilitation, in Labor Arbitration and Industrial Change, Proceedings of the 16th Annual Meeting, National Academy of Arbitrators 104 (1963)." (Emphasis added.) Id., 191–92.

The court concluded: "It can well be doubted whether the parties to collective bargaining agreements would long continue to provide for detailed grievance and arbitration procedures . . . if their power to settle the majority of grievances short of the costlier and more time-consuming steps was limited by a rule permitting the grievant unilaterally to invoke arbitration. Nor do we see substantial danger to the interests of the indi-

vidual employee if his statutory agent is given the contractual power honestly and in good faith to settle grievances short of arbitration. . . . The dampening effect on the entire grievance procedure of this reduction of the union's freedom to settle claims in good faith would surely be substantial. Since the union's statutory duty of fair representation protects the individual employee from arbitrary abuses of the settlement device by providing him with recourse against [his] . . . union, this severe limitation on the power to settle grievances is neither necessary nor desirable." Id., 192–93.

We conclude that under the balancing test set forth in *Mathews* v. *Eldridge,* supra, the plaintiff received all the process that he was due.[19] We recognize that the employee's interest in his employment is great. That interest, however, is tempered by the government's interest in an orderly termination process, the minimal risk of an erroneous deprivation of the plaintiff's property interest under the grievance procedures in the collective bargaining agreement, the minimal incremental value of additional or substitute procedural safeguards and the adverse effect additional procedures would have on the labor relations process.

---

[19] We do not hold that the existence of grievance procedures in a collective bargaining agreement automatically satisfies an employee's right to due process. Each "collective [bargaining] agreement must withstand constitutional examination." M. Finkin, "The Limits of Majority Rule in Collective Bargaining," 64 Minn. L. Rev. 183, 255 (1980). Furthermore, while other jurisdictions have held that the provisions of the collective bargaining agreement constitute a waiver of an employee's right to due process, we do not so hold. See *Gorham* v. *Kansas City,* 225 Kan. 369, 590 P.2d 1051 (1979); *Thompson* v. *Unified School District No. 259, Wichita,* 16 Kan. App. 2d 42, 819 P.2d 1236 (1991); *Antinore* v. *State,* 49 App. Div. 2d 6, 371 N.Y.S.2d 213 (1975), aff'd, 40 N.Y.2d 921, 358 N.E.2d 268, 389 N.Y.S.2d 576 (1976); *Pennsylvania Social Services Union* v. *Pennsylvania Board of Probation & Parole,* 508 A.2d 360 (Pa. Cmwlth. 1986); but see *Phillips* v. *California State Personnel Board,* 184 Cal. App. 3d 651, 229 Cal. Rptr. 502 (1986); *Brady* v. *Board of Trustees of the Nebraska State Colleges,* 196 Neb. 226, 242 N.W.2d 616 (1976); see also M. Finkin, supra.

Our conclusion that the plaintiff's due process rights were satisfied in this case is an accord with the conclusions of other jurisdictions. See *Parrett* v. *Connersville,* 737 F.2d 690 (7th Cir. 1984); *Lewis* v. *Hillsborough Transit Authority,* 726 F.2d 664 (11th Cir. 1983); *Jackson* v. *Temple University,* 721 F.2d 931 (3d Cir. 1983); *Winston* v. *United States Postal Service,* 585 F.2d 198 (7th Cir. 1978); *Pennsylvania Social Services Union* v. *Pennsylvania Board of Probation & Parole,* 508 A.2d 360 (Pa. Cmwlth. 1986); *Hanson* v. *Madison Service Corporation,* 150 Wis. 2d 828, 443 N.W.2d 315 (Wis. App. 1989).

In *Winston* v. *United States Postal Service,* supra, 208, the United States Court of Appeals for the Seventh Circuit noted that "[v]esting the Union with control of all grievances increases the likelihood of uniformity and reduces 'a potential source of competitions and discriminations that could be destructive of the entire structure of labor relations in the plant.' It prevents dissident minorities from pressing real or imagined grievances in an effort to squeeze the last drop of competitive advantage out of each grievance." Finally, the court noted that "[a]llowing an individual to compel arbitration whenever he is dissatisfied with the company-union adjustment would discourage day-to-day cooperation between union and company in which grievances are treated as problems to be solved. Public officials and arbitrators, as well as employers, constantly remind union officials that they have a duty to discountenance disruptive and frivolous claims. If they are to accept this responsibility, union officials should be given the power to make their decisions effective." Id. The court further noted that "[a]lthough their representative declined their requests to demand arbitration, appellants could have sued the Union for breach of its duty to fairly represent them if the refusal to

demand arbitration was not in good faith. 39 U.S.C. § 1208 (c); *Vaca* v. *Sipes,* supra at 194–95, 87 S. Ct. at 918–19." Id., 210. The same considerations apply to this case.

The judgment is reversed and the case is remanded to the Appellate Court with direction to remand the case to the trial court with direction to render judgment in favor of the defendant.

In this opinion the other justices concurred.